IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Kevin Patton,                                            :
                        Plaintiff                        :        Civil Action 2:12-cv-00427

            v.                                           :        Judge Economus

Carolyn W. Colvin,                                       :        Magistrate Judge Abel
Acting Commissioner of Social Security,
                        Defendant                        :

**REPORT AND RECOMMENDATION**

Plaintiff Kevin Patton brings this action under 42 U.S.C. §§405(g) for review of a

final decision of the Commissioner of Social Security denying his application for Social

Security disability insurance benefits.  This matter is before the Magistrate Judge for a

report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.**  Plaintiff Patton alleges that he was injured at work on

October 24, 2000 while working for the United States Post Office. Patton was attempting

to lift an unstable box that weighed approximately 70 pounds. He had spine surgery,

physical therapy, and injections. In 2002, he had a lumbar diskogram. In September

2003,  Patton underwent a posterior lumbar interbody fusion with hardware

stabilization, but he had no relief. A second surgery was performed to remove the

interbody fusion device and replace it with a posterior lumbar interbody fusion with a

tangent wedge. Patton last worked in June 2006. He was then 43 years old.

The administrative law judge found that Patton retained the physical ability to

perform sedentary work and that his depression imposed no significant limitations on

his ability to work. Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge's determination that Patton did not have any significant mental limitations is not supported by substantial evidence;
- The administrative law judge improperly relied upon Dr. Kendrick's testimony with respect to whether Patton met or equaled any listed impairment; and,
- The administrative law judge improperly evaluated plaintiff's allegations of pain.

**Procedural History.**  Plaintiff Kevin Patton filed his application for disability insurance benefits on March 28, 2008, alleging that he became disabled on June 2, 2006, at age 43, by nerve damage in his back and multiple other back problems.  (R. 190, 210.) The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On June 1, 2010 and August 18, 2010, an administrative law judge held hearings at which plaintiff, represented by counsel, appeared and testified.  (R. 7, 68.)  A vocational expert and a medical advisor  also testified.  On December 9, 2010, the administrative law judge issued a decision finding that Patton  was not disabled within the meaning of the Act.  (R. 102-10.)  On March 15, 2012, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 1-3.)

**Age, Education, and Work Experience.**  Kevin Patton was born March 25, 1963. (R. 190.) He has a high school education and attended one year of college.  (R. 12, 299.)

He has worked as a factory supervisor and as a rural route carrier for the United States

Postal Service. He last worked June 2, 2006. (R. 210-11.)

**Plaintiff's Testimony.** The administrative law judge fairly summarized Patton's

testimony as follows:

> The claimant testified at the June 1, 2010 hearing that he was born on
> March 25, 1963 and that he is 47 years old. He is a high school graduate
> with one year of college and some aircraft maintenance training. He is six
> feet tall and weights 250 pounds. He is married and has two children, ages
> nine and three and a half. He drives, although he experiences leg pain
> after about 30 minutes.
>
> The claimant alleged that he has been unable to work since June 2006
> because his entire body is in pain. He has pain in his lower back, feet, hips,
> shoulders, and all of his joints. He explained that he had injured his back
> at work and damaged some of his nerves. He had three surgeries after
> that. **He then filed a claim for Workers' Compensation; he currently
> receives Workers' Compensation benefits.** He tried to work for seven
> months after that and then had to have surgery again. He said at the
> hearing that his feet were swollen, and he had pain in his legs and knees,
> which give out. He has joint pain and degenerative joint disease in his
> ankle, which gives out once in a while. He hurt his ankle playing baseball.
> Any prolonged activity increases his pain. He tried a TENS unit for pain
> control but it did not work. He has participated in physical therapy and he
> recently started counseling and chiropractic treatment. A whirlpool is
> helpful, as is low humidity. His pain is generally a "ten" on a scale of one
> to ten when he wakes up, and is less after he takes his medication. He has
> arthritis in his hips and back for which he takes Celebrex. His medications
> are effective as they take his pain away so that he can lead a normal life.
> He is glad he has the medication, even though it causes side effects of
> constipation, difficulty thinking, difficulty sleeping, and sometimes
> difficulty concentrating. On a bad day, he will stay in his recliner for most
> of the day. The doctor gave him some injections and prescribed a cane for
> balance.
>
> The claimant has hypertension controlled with medication. He has sleep
> apnea but does not use the C-PAP machine any more. He used to enjoy

3

playing golf, going bowling, and playing softball and racquetball, but he does not do any of that now.

The claimant next explained that he has mental problems. He has been depressed since his first surgery failed, which was 2003. He has been having panic attacks for the last three or four years. They last about 20 minutes and he takes Xanax when they occur. The claimant testified that he can follow  simple work rules, get along with coworkers, respond to those in authority, and deal with routine changes. He did this in the past and believes he could do it now.

On a typical day, the claimant reads the Bible, watches television for four to five hours every day, and keeps up his appearance and hygiene. He pays an occasional bill from a checking account , although his wife generally pays the bills. He stated that he can walk up to 25 yards at a time for ten or 15 minutes. He stated that he can sit about 30 minutes at a time, and he reported that he can bend at the waist four or five times in an hour. He can reach in front and overhead. He can lift 20 pounds and carry that much for 20 or 25 feet. He has good use of his hands. He can write a letter, load the dishwasher, and vacuum occasionally. He does not cook or do laundry. He goes to the grocery store with his wife and does some gardening. He uses a riding lawnmower to cut the grass on his 1/4 acre lot. He can feed and dress himself. He watches his four year old daughter twice a week. He goes to church on Sunday and goes out to eat afterwards occasionally. He does not drink alcohol but he smokes a package of cigarettes every day. His wife works and he receives Workers' Compensation of $1600.00 every month.

(R. 106-07.) (Emphasis in original.)

**Medical Evidence of Record.**  Although the administrative law judge's decision fairly sets out the relevant medical evidence of record, this Report and Recommendation will summarize that evidence in some detail.

**Physical Impairments.**

Bradford B. Mullin, M.D. Dr. Mullin, a neurological surgeon, provided treatment notes from April 5, 2001 to June 30, 2005. Patton reported severe pain in his back and legs. (R. 306, 307.)

On November 26, 2002, Dr. Mullin indicated that Patton's discogram verified bilateral spondylolysis and that his pain generated from L5-S1. (R. 317.) On September 5, 2003, Dr. Mullin performed a laminectomy with fixation and fusion. (R. 314.) On October 27, 2003, Patton underwent surgery to remove the interbody device and have it replaced with a tangent wedge for interbody fusion. The procedure went well. (R. 310.) On December 23, 2003, Dr. Mullin indicated that plaintiff was not having back pain. (R. 311.) In February 12, 2004, Dr. Mullin reported that plaintiff was slowly and progressively improving. Plaintiff reported knee pain unrelated to his back. (R. 309.) On May 13, 2004, Dr. Mullin reported that plaintiff was improving significantly and that his fixation/fusion construct was healing well. (R. 308.) On June 30, 2005, Dr. Mullin reviewed plaintiff's myelogram, which showed some bulging in the L3-4 disc with some relative stenosis. Dr. Mullin did not believe surgery was appropriate and discussed steroid injections, instrumentation removal, and physical therapy. (R. 305.)

James J. Sardo, M.D. Dr. Sardo, a physical medicine and rehabilitation physician, began treating Patton in 2000. (R. 450-51.)  On August 8, 2005, plaintiff had a steady gait and was able to perform toe and heel walking. Lumbar flexion was reduced by 25%. He had 0° extension. Side bending was approximately 5° bilaterally. Patton was tender across the lumbar paraspinals. His motor strength was 5/5 in the lower limbs. Sensation

was intact. Dr. Sardo diagnosed chronic low back pain status post fusion and intermittent radicular symptoms into the right lower limb. Recent imaging revealed lateral recess stenosis at L3-4 and L4-5 along with disk bulging at L3-4. (R. 443-45.)

On October 13, 2004, plaintiff reported that he had ongoing pain across his back, although he was significantly better after the epidural injections. Patton had intermittent numbness on the bottom of his right foot. Dr. Sardo diagnosed status post lumbar fusion and evidence of L3-4 disk bulge with stenosis. (R. 435.)

A July 6, 2005 diagnostic polysomnography revealed very severe obstructive sleep apnea causing fragmented sleep with distorted sleep architecture and significant desaturations. It was recommended that plaintiff undergo a CPAP titration study and lose weight.(R. 424.)

Elie M. Saab. M.D. On August 10, 2005, plaintiff was seen at the Sleep Center. Patton's CPAP leaked, which was likely responsible for his desaturation. It was recommended that Patton use a mask with a humidifier and a chin strap or a full face mask. (R. 423.)

A March 6, 2006 MRI of Patton's lumbar spine showed stable degenerative disc change a L3-4 and narrowing of the right lateral recess at L5-S1, stable. (R. 414-15.)

An October 3, 2006 MRI showed minimal diffuse disc bulging, spurring and facet hypertrophy with minimal central canal narrowing at L2-3; spurring, diffuse disc bulging and facet hypertrophy with mild central canal narrowing and mild bilateral neural foraminal narrowing at L3-4; spurring diffuse disc bulging and facet

6

hypertrophy with minimal central canal narrowing and mild bilateral neural foraminal narrowing at L4-5; and prior status post spinal fusion at L5-S1 with some perithecal enhancement along the right lateral recess surrounding the right S1 nerve root and some narrowing at the right proximal neural foramen. (R. 407-08.)

Nerve conduction studies and an EMG on November 28, 2006 revealed findings consistent with chronic neuropathic changes in an L5 distribution. (R. 433-34.)

On December 14, 2006, Dr. Sardo stated that plaintiff described his pain as a constant, sharp, tender, burning sensation in the lower back with radiation primarily into the right leg, although he also had symptoms in his left leg. At its worst, the pain was a ten on a ten-point scale; at its best, the pain was a four. Pain was aggravated with activity. He had some relief with medication, heat, cold and stretching. On physical examination, lumbar flexion was reduced by 50%. He had 0° extension. Patton was tender across the lumbar paraspinals. He had motor strength of 5/5 in the lower limbs. Sensation was decreased to pinprick in the right lower limb below the knee. Reflexes were 1+ at both knee, trace at the right ankle, and 1+ at the left ankle. (R. 431-32.)

Plaintiff received physical therapy from Adena Rehabilitation. (R. 344-66.)

Pietro Seni, M.D., C.I.M.E. On February 27, 2007, Dr. Seni performed an independent medical evaluation of Patton. Dr. Seni diagnosed status post revised back surgery with further decompression and most likely chronic neuropathy of the right L5 nerve root with epidural and perineural fibrosis around the nerve root. Dr. Seni also

concluded that Patton had permanent L5 neuropathic fibrosis changes on the L5 nerve root. (R. 644-50.)

Larry Todd, Jr. D.O. On March 14, 2007, Dr. Todd, an orthopedic spine surgeon, noted that plaintiff had persistent back discomfort. Dr. Todd recommended epidurals and lumbar facet blocks. Further surgery was not indicated. (R. 455-56.)

On August 27, 2007, Dr. Todd indicated that Patton needed a formal functional capacity evaluation and recommended that he be referred for consideration of a spinal cord stimulator. (R. 628-29.)

On November 8, 2007, Patton underwent a functional capacity evaluation through Adena Rehabilitation. Patton performed in the sedentary strength range. His bilateral shoulder flexion and abduction was decreased by 10%. His trunk flexion was decreased by 50%. His trunk extension was decreased by 90%. His trunk rotation was decreased by 50%. His trunk side-bending was decreased by 25%. His bilateral hip internal rotation was decreased by 10%. Patton was unable to perform any lifting task at a rate significant enough for endurance testing purposes. (R. 372-73.)

On August 25, 2008, Dr. Todd opined that Patton could lift up to 40 pounds. (R. 627.)

Jeffrey Hill, M.D. On August 31, 2007, Dr. Hill, a physician with the Adena Regional Medical Center Occupational Health Center, examined plaintiff. Dr. Hill noted that plaintiff had a reduced range of motion, reduced deep tendon reflexes, an inability to walk on his toes, an antalgic gait, and loss of lumbar lordosis. (R. 585.)

8

A January 9, 2008 MRI of Patton's lumbar spine revealed mild degree of disc space narrowing at the L5-S1 level with disc degeneration. At the L3-L4 level, there was evidence of facet joint osteoarthritis and hypertrophy of the ligamentum flava. There was a mild degree of central canal stenosis. At the L4-L5 level, there was evidence of facet joint hypertrophy and of the ligamentum flava. No significant disc herniation was seen. There was a mild degree of central canal stenosis. At the L5-S1 level, there was evidence of prior surgery and scarring on the right side of the midline. (R. 367-68.)

A January 24, 2008 nerve conduction study and EMG revealed results consistent with a chronic left L5 radiculopathy. (R. 626.)

In his July 16, 2008 treatment note, Dr. Hill stated:

. . . I viewed the videotape that was provided by the investigators on July 2, 2008, which was about 21 minutes in length. It did show relatively preserved motion of his lumbosacral spine, which is greater than what I have ever observed in my clinic. In addition, the video revealed that he was capable of lifting up 3 gallons of gas in a fluid and unlimited fashion, and I was concerned whether or not there was any lack of veracity between this gentleman's reported abilities versus what was identified on video. He stated that he did ask the inspectors to leave his primary residence because he became a little bit anxious and irritated that they were videotaping him. He stated that all the activities he was participating in were approved by me, and I did sign a list of 18 activities, which included everything from light carpentry/woodwork to walking, running, jogging, to carrying in groceries, to swim or wade in the water, fishing and hunting, golfing, but he was told that he might not be very successful at that, cleaning gutters, etc., picking up and carrying son and daughter, cleaning house, clean out garage and shed, carry in wood, play ball with son, paint or stain, power wash the garage with the use of a back brace, wash and clean automobile, weed-eat with a back brace only, garden, planting, harvesting, pulling weeds, and mowing the law with a push or pull-type mower with 30 minutes on and 30 minutes off. I did indicate on a handwritten note that I agree with these activity levels, but the chronic

> prolonged activity may cause increased pain. The concerning point is when one views the video, which, of course, is an edited content video down to 21 minutes, it does show him with relatively preserved function of his lumbosacral spine and upper extremities; however,
>
> [sic] Mr. Patton has a valid point that since the video was edited there was no data to verify what his functional status was after the events that were caught on videotape, and based on that really, even though the veracity of this gentleman was at least initially questioned, I do not get the impression that he is attempting to manipulate the system.

(R. 551.) Dr. Hill reported that he opined to the United States Postal Service that it appeared that plaintiff had misrepresented his medical condition and physical capabilities to him. *Id.*

On December 12, 2008, Dr. Hill noted that plaintiff had continued pain in his lumbosacral spine, legs, and feet. Dr. Hill recommended that plaintiff undergo a functional capacity evaluation. (R. 500-01.)

On January 12, 2009, Dr. Hill examined plaintiff. Although plaintiff could ambulate from the waiting room to the clinic without an assistive device, his gait was slow. He had 29° of forward flexion of his lumbosacral spine, 19° of extension, 16° of left lateral flexion, 10° of right lateral flexion. Plaintiff expressed pain going from the flexion position to the standing erect position. Deep tendon reflexes were equal and symmetrical with a negative straight leg bilaterally. He reported increased lumbosacral spinal pain. There was no edema, effusion, ecchymosis, erythema, or atrophy. (R. 498-99.)

On May 18, 2009, Dr. Hill noted that plaintiff's primary care doctor suggested that plaintiff might have fibromyalgia, but Dr. Hill believed that plaintiff's pain was related to his lumbosacral spinal pathology. An April 3, 2009 MRI revealed a mild degree of disk space narrowing at L3-L4, although there was no significant disk herniation. There was no evidence of a herniated nucleus pulposus, but there was evidence of facet joint osteoarthritis. At L4-L5 the disk height was well maintained. There was no significant degeneration. At L5-S1, there was mild degree of disk space narrowing and disk degeneration. There was evidence of scarring in the posterior aspect of the right side of the canal in keeping with prior surgery. (R. 515.)

On March 9, 2009, Dr. Hill noted that plaintiff reported he was fired for misconduct. (R. 523.) On April 6, 2009, Dr. Hill indicated that he would continue plaintiff's pain medications and there were no further treatment options available to him. (R. 520-21.) On June 22, 2009, Patton reported increased pain. (R. 512.) On July 20, 2009, Dr. Hill noted that Patton's employer had not been able to accommodate his limitations. Dr Hill recommended that Patton undergo consultation for possible pain interventions, including lysis of adhesions and/or scarring and for mental health evaluation based on anxiety and depression. (R. 509-10.)

Dr. Hill treated Patton throughout 2009 and 2010 for pain in his lumbosacral spine with radiation into the lower extremities. On February 4, 2010, plaintiff reported having numbness and tingling in his feet and buttocks with prolonged sitting. (R. 754.)

11

On July 26, 2010, Dr. Hill stated that plaintiff reported that he had been falling recently. (R. 735.)

On January 11, 2011, Dr. Hill completed a medical source statement regarding Patton's physical capacity. He opined that plaintiff could occasionally lift up to 20 pounds and frequently lift up to 10 pounds. Patton could stand and/or walk for a total of 1 hour a day. He could stand and/or walk for 30 minutes at a time. Although Dr. Hill indicated that plaintiff's ability to sit was affected by his impairment, he did not identify how many hours he could sit in a day and for how long without interruption. Patton could rarely climb, balance, stoop, crouch, kneel or crawl. He could occasionally reach, handle, feel or perform gross manipulation. He could frequently perform fine manipulation. He could never push or pull. Patton should avoid heights and moving machinery. Dr. Hill opined that plaintiff required rest for some period during the work day in addition to a morning break, lunch, and afternoon break. He indicated that plaintiff had been prescribed a cane and a TENS unit. Patton required a sit/stand option. Dr. Hill noted that plaintiff experienced severe pain. (R. 770-71.)

In an January 30, 2012 letter, Dr. Hill opined that plaintiff was not capable of gainful remunerative employment in any capacity based on the results of a functional capacity evaluation, multiple clinical examinations, and an assessment of his vocational skills. (R. 954.)

Eli Perencevich, D.O. On May 27, 2008, Dr. Perencevich, a State Agency reviewing physician, completed a physical residual functional capacity assessment. Dr.

12

Perencevich concluded that plaintiff could occasionally lift and/or carry 20 pounds and

frequently lift and/or carry 10 pounds. He could stand and/or walk about 6 hours in an

eight hour day. He could sit with normal breaks for about 6 hours in an eight hour day.

He was unlimited in his ability to push and/or pull. Plaintiff could frequently climb

ramps or stairs, but he could never climb ladders, ropes, or scaffolds. Plaintiff could

occasionally balance, stoop, kneel, crouch, or crawl. Dr. Perencevich concluded that

plaintiff's allegations were only partially credible. (R. 473-79.)

On October 6, 2008, Ronald Cantor, M.D. reviewed the evidence in the file and

affirmed the assessment. (R. 489.)

Karl V. Metz, M.D. On July 8, 2008, Dr. Metz examined plaintiff. In an August 4,

2008 letter, Dr. Metz indicated his belief that plaintiff's work-related injuries would not

prohibit past relevant work. Dr. Metz viewed a surveillance video of Patton and stated:

> Based upon the information provided in the surveillance video, it is my
> opinion, within reasonable medical certainty that on all dates of
> surveillance, the claimant, Kevin Patton, did not exhibit any objective
> features of guarding of his low back, evidence of pain during the
> performance of multiple activities, during which the claimant engaged in
> hyperflexion as well as twisting/rotation of his low back. He did not
> demonstrate difficulty or limitation of his ability to squat and return to an
> upright position. He did not demonstrate abnormalities of gait and station
> during the surveillance. Therefore, based upon my review of the data, it is
> my opinion that the claimant is capable of returning to his full duties as a
> rural letter carrier without restrictions.

(R. 480-81.) Dr. Metz concluded that plaintiff's allegations of pain in the July 8, 2008

examination were not supported by the objective findings in the surveillance video. In

the July 8, 2008 examination, plaintiff complained of constant pain in his lower back,

legs and feet, right ankle pain, and difficulty standing, sitting, walking, pushing, pulling, climbing, squatting, riding and driving. (R. 481.)

James E. Fleming, Jr. M.D. On September 9, 2008, Dr. Fleming conducted an initial spine consultation. On physical examination, plaintiff ambulated with a flexed forward position. He was unable to heel and toe walk. Dr. Fleming recommended physical therapy and pain management. (R. 621-22.)

Mark A. Holt, M.D. On October 8, 2008, Dr. Holt examined Patton for the U.S. Department of Labor. Dr. Holt concluded that Patton's aggravations of degenerative disk disease at L5-S1, lumbar stenosis, and lumbar spondylosis had resolved. He opined that plaintiff could perform a substantial portion of his regular duties as a rural mail carrier except for limitations with respect to lifting. Dr. Holt opined that plaintiff could occasionally lift up to 40 pounds and frequently lift up to 30 pounds. (R. 490-97.)

Northridge Family Practice. Records from Northridge Family Practice dated February 26, 2009, stated that all movements were painful for Patton and he exhibited localized muscle tenderness. (R. 614.)

Richard M. Ward, M.D. On March 26, 2009, Dr. Ward examined plaintiff for the purpose of a disability evaluation. Plaintiff reported that he had constant pain in the lower portion of his back radiating into his both thighs, calves, and feet. He had reported muscle spasms and stiffness. His symptoms were aggravated by bending, lifting, twisting, sitting for longer than ½ hour in a soft seat, standing in one position for longer than 10 minutes and walking further than 1/4 of a block.

14

On physical examination, plaintiff walked slowly because of pain radiating into his thighs, calves and feet. He had to push himself up from a seated position because of this pain. He had involuntary muscle spasm. With his pelvis stabilized, Patton could not hyperextend beyond neutral. He had 20 degrees of forward flexion, 10 degrees of right lateral tilt, and 10 degrees of left lateral tilt. There was no weakness on manual testing. Both knee jerks were equal at trace.  Straight leg raising was painful at 40 degrees on both sides. Sensation in both legs was intact. His calf circumference measurements were equal.

Dr. Ward opined that plaintiff had aggravation of degenerative disc disease at L5-S1, aggravation of lumbar stenosis, aggravation of lumbar spondylosis, and L5 radiculopathy. The conditions were not corrected despite three surgeries. (R. 507-08.)

On August 26, 2009, Dr. Halley reported that he found changes consistent with an L4 radiculopathy and concluded that plaintiff should not lift over 20 pounds. ( ^43-54.)

David K. Halley, M.D. On May 29, 2009, Dr. Halley performed an individual medical evaluation. Dr. Halley opined that Patton could not return to work as a rural letter carrier, but he could perform light duty work activity. Dr. Halley opined that plaintiff could sit for two hours, walk for ten minutes per hour, and stand for 20 minutes at a time. (R. 655-661.)

On July 14, 2009, plaintiff had x-rays of his feet taken. He had degenerative joint disease of the first MTP joint of his left foot. His right foot had no evidence of plantar heel spur. (R. 715-16.)

Anthony C. Freeman, M.D. On November 4, 2009, Dr. Freeman recommended that plaintiff have a trial of a dorsal column stimulator. (R. 662.)

**Psychological Impairments.**

Jonathan Lehman, Pys. D. On August 19, 2009, Dr. Leham, a psychologist with the Veteran's Administration, performed a psychological consultation. On mental status examination, plaintiff was alert and oriented in three spheres. His hygiene and behavior were appropriate. There was no evidence of a thought disturbance, and his insight was adequate. Dr. Lehman diagnosed mood disorder due to a medical condition (chronic pain and apnea). He assigned a Global Assessment of Functioning "GAF" score of 65. (R. 721-22.)

James P. Hagen, Ph.D. On August 25, 2009, Dr. Hagen, a psychologist, completed a diagnostic interview. On mental status examination, plaintiff was oriented in all four spheres. He was depressed, but stable. His thought processes were logical, and there was no indication of psychosis. His concentration and attention were impaired. He was anhedonic. Dr. Hagen diagnosed major depression, single episode without psychosis, severe. He assigned a GAF score of 50. Dr. Hagen recommended that plaintiff undergo individual therapy. He noted that plaintiff's prognosis was guarded. (R. 651-52.)

In a May 28, 2010 letter, Dr. Hagen noted that plaintiff showed symptoms of anhedonia, psychomotor retardation, inattentiveness and irritability. When experiencing minor stress, plaintiff became irritable or anxious. Patton's ability to concentrate and follow complex instructions were impaired by chronic pain. (R. 708.)

On August 11, 2010, Dr. Hagen reported that Patton's depression, panic disorder, and features of PTSD, in combination with his medical conditions were disabling. Dr. Hagen met with Patton on seven occasions. Patton showed all the behavioral signs consistent with chronic pain. He exhibited obvious wincing, the need to reposition, slow and careful movements, and anxiety in public settings. Dr. Hagen indicated that plaintiff could perform minimal activities of daily living, but activities requiring ongoing movement were not possible. (R. 763-68.)

John Layh, Ph.D.  On January 18, 2012, Dr. Layh completed a medical source statement with respect to Patton's mental capacity. He indicated that plaintiff's ability to follow work rules was very good and his abilities to use judgment and interact with a supervisor were good. His abilities to respond appropriately to changes in routine work settings, deal with the public, relate to co-workers, function independently without special supervision, and work in coordination with or proximity to others without being unduly distracted or distracting were fair. His abilities to respond appropriately to changes in routine settings, maintain regular attendance and be punctual, and deal with work stresses were poor. His ability to complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a

17

consistent pace without an unreasonable number and length of rest periods were poor.

His ability to understand, remember and carry out complex job instructions was fair.

His ability to understand, remember and carry out simple job instructions was good.

Patton's abilities to maintain appearance and manage funds or schedules were good.

His abilities to socialize and relate predictably in social situations were fair. His ability

to behave in an emotionally stable manner was poor. Dr. Layh noted that plaintiff

suffered from major depressive disorder. (R. 957-58.)

**Administrative Law Judge's Findings.**

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in any substantial gainful activity since June 2, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following medically determinable impairments: hypertension, bilateral L5 spondylolysis status post three back surgeries at L5-S1, lumbar spondylosis with L5 radiculopathy and repair of a pseudoarthrosis, a major depressive disorder (Exhibit 16F), and obstructive sleep apnea (20 CFR 404.1520(c)). John Bohlen, M.D. also diagnosed an adjustment reaction with a brief depressive reaction (Exhibit 25F, page 4).

5.[1] Collectively, these impairments are "severe" because they impose more than a minimal functional limitation on the claimant's ability to perform basic work activity.

6. The medical expert, Dr. Ronald Kendrick, testified that the claimant does not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404,

---

[1]The decision numbers the findings incorrectly, but this Report and Recommendation will adopt the same numbering as that of the administrative law judge.

Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526.) I concur.

7.     After careful consideration of the entire record, I find that the claimant has the physical residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles such as docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves primarily sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and the other sedentary criteria are met. He has no significant limitations.

8.     The claimant is unable to perform any of his past relevant work (20 CFR 404.1565).

9.     The claimant was born on March 25, 1963 and he was 43 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

10.    The claimant has a high school education plus a year of college, and he is able to communicate in English (20 CFR 404.1564).

11.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

12.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

13.    The claimant was not under a disability, as defined in the Social Security Act, at any time from June 2, 2006, through the date of this decision (20 CFR 404.1520(g)).

(R. 104-10.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive.  . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge's determination that Patton did not have any significant mental limitations is not supported by substantial evidence. Plaintiff argues that an impairment can be considered "not severe" only if the impairment is a slight abnormality that has such a minimal effect on an individual that it would not be expected to interfere with the individual's

ability to work, irrespective of age, education, and work experience. Plaintiff maintains that the administrative law judge relied on the opinion of Dr. Bohlen, plaintiff's family practice physician, rather than the findings of his psychologist, when he concluded that Patton did not have any mental limitations. Plaintiff further argues that the administrative law judge failed to address Dr. Hagen's findings or articulate what, if any, weight was given to his opinion.

- The administrative law judge improperly relied upon Dr. Kendrick's testimony with respect to whether Patton met or equaled any listed impairment. According to plaintiff, Dr. Kendrick only addressed plaintiff's physical impairments; he did not offer any opinion regarding his mental status. Dr. Kendrick also failed to specify what limitations resulted from plaintiff's sleep apnea. Plaintiff argues that the evidentiary record establishes that Patton has multiple impairments that must be considered in combination under the Listings and in determining his residual functional capacity. The administrative law judge improperly relied on Dr. Kendrick's restricted testimony.

- The administrative law judge improperly evaluated plaintiff's allegations of pain. Plaintiff argues that the administrative law judge's credibility assessment was based on his testimony and Dr. Kendrick's testimony without consideration of the medical evidence as a whole. The evidence of record

21

includes three significant lumbar surgeries, EMG results confirming chronic left L5 radiculopathy, and his pain management physician's diagnosis of pain originating in the lumbosacral spine and radiating into the lower extremities and post laminectomy syndrome.

**Analysis.**  The administrative law judge concluded that plaintiff's mental impairment did not meet or medically equal 12.04 of the Listings. The administrative law judge found that plaintiff had only a slight or mild restriction of his daily activities based on his reported activities. Patton testified that he read the Bible, watched televison 4-5 hours per day, kept up his appearance. He occasionally paid bills. He could write a letter, load the dishwasher and vacuum. He went to the grocery store with his wife. He gardened and used a riding lawnmower to cut the grass. He could feed and dress himself without assistance. He watched his four year old daughter twice a week. He attended church and went out to eat.

Based on his testimony that he could get along with co-workers, respond to those in authority, and deal with routine changes, the administrative law judge concluded that Patton had no difficulty with social functioning. The administrative law judge determined that plaintiff had only mild difficulties with concentration, persistence or pace. Plaintiff testified that side effects from his medications included difficulty thinking and concentrating. The administrative law judge indicated that Dr. Hagen had reported that plaintiff's memory was largely intact, although his concentration and attention were impaired. *(R. 105.)* In formulating his residual functional capacity, the

22

administrative law judge specifically found that Patton had no significant mental limitations. (R. 106.)

With respect to Dr. Hagen, plaintiff's treating psychologist, the administrative law stated that plaintiff had reported that his prior employer had been videotaping him at home and in public in an effort to portray him as malingering and that he engaged in little activity for fear of being filmed. Dr. Hagen noted that plaintiff had a dysthymic mood and that he was depressed but stable.

The administrative law judge's conclusion that plaintiff did not have any significant mental limitations is supported by substantial evidence in the record. In his August 2009 psychological consultation at the Veteran's Administration, plaintiff reported no history of mental health treatment or use of psychotropic medications. (R. 721.) Plaintiff was assigned a GAF score of 65. (R. 722.) Dr. Hagen's opinion that plaintiff was disabled based on a combination of his physical and mental conditions was not entitled to deference. The determination of whether a claimant is disabled is reserved to the Commissioner and such statements are not entitled to controlling weight or special significance. 20 C.F.R. § 404.1527(e); Social Security Ruling 96-5p. Furthermore, Dr. Hagen, as a psychologist, did not have the medical training necessary to evaluate the combined impact of plaintiff's physical and mental impairments.

Listing 12.04. Plaintiff also argues that the administrative law judge improperly relied upon Dr. Kendrick's testimony with respect to whether Patton met or equaled any listed impairment. Although Dr. Kendrick did not provide any testimony with

respect to plaintiff's mental limitations, the administrative law judge properly

considered whether plaintiff or met or equaled Listing 12.04 as previously discussed.

The record contained ample evidence regarding the extent of plaintiff's mental

limitations for the administrative law judge to determine whether the mental health

evidence satisfied the criteria of the listing for an affective disorder.

<u>Pain</u>. Pain is an elusive phenomena. Ultimately, no one can say with absolute

certainty whether another person's subjectively disabling pain and other symptoms

preclude all substantial gainful employment. The Social Security Act requires that the

claimant establish that he is disabled. Under the Act, a "disability" is defined as

"inability to engage in any substantial gainful activity *by reason of any medically*

*determinable or mental impairment* which can be expected . . . to last for a continuous

period of not less than 12 months. . . ." 42 U.S.C. §423(d)(1)(A) (emphasis added).

Under the provisions of 42 U.S.C. §423(d)(5)(A), subjective symptoms alone

cannot prove disability. There must be objective medical evidence of an impairment

that could reasonably be expected to produce disabling pain or other symptoms :

> An individual's statement as to pain or other symptoms shall not
> alone be conclusive evidence of disability as defined in this section;
> there must be medical signs and findings, established by medically
> acceptable clinical or laboratory diagnostic techniques, which show
> the existence of a medical impairment that results from anatomical,
> physiological, or psychological abnormalities which could
> reasonably be expected to produce the pain or other symptoms
> alleged and which, when considered with all evidence required to be
> furnished under this paragraph (including statements of the
> individual or his physician as to the intensity and persistence of such
> pain or other symptoms which may reasonably be accepted as

consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Commissioner's regulations provide a framework for evaluating a claimant's symptoms consistent with the commands of the statute:

(a) *General*. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c). By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and

25

> laboratory findings and statements about how your symptoms affect you.  (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.)  We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. §404.1529(a). A claimant's symptoms will not be found to affect his ability to work unless there is a medically determinable impairment that could reasonably be expected to produce them. 20 C.F.R. § 404.1529(b). If so, the Commissioner then evaluates the intensity and persistence of the claimant's pain and other symptoms and determines the extent to which they limit his ability to work. 20 C.F.R. § 404.1529(c). In making the determination, the Commissioner considers

> all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating or nontreating source, or other persons about how your symptoms affect you. We also consider the medical opinions of your treating source and other medical opinions . . . .

*Id.*

In this evaluation of a claimant's symptoms, the Commissioner considers both objective medical evidence and "any other information you may submit about your symptoms." 20 C.F.R. § 404.1529(c)(2). The regulation further provides:

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence

and other evidence, will be taken into account as explained in paragraph
(c)(4) of this section in reaching a conclusion as to whether you are
disabled. We will consider all of the evidence presented, including
information about your prior work record, your statements about your
symptoms, evidence submitted by your treating or nontreating source,
and observations by our employees and other persons. Section 404.1527
explains in detail how we consider and weigh treating source and other
medical opinions about the nature and severity of your impairment(s) and
any related symptoms, such as pain. Factors relevant to your symptoms,
such as pain, which we will consider include:

    (I) Your daily activities;

    (ii) The location, duration, frequency, and intensity of your pain or
other symptoms;

    (iii) Precipitating and aggravating factors;

    (iv) The type, dosage, effectiveness, and side effects of any medication
you take or have taken to alleviate your pain or other symptoms;

    (v) Treatment, other than medication, you receive or have received for
relief of your pain or other symptoms;

    (vi) Any measures you use or have used to relieve your pain or other
symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes
every hour, sleeping on a board, etc.); and

    (vii) Other factors concerning your functional limitations and
restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). When determining the extent to which a claimant's

symptoms limit his ability to work, the Commissioner considers whether the claimant's

statements about the symptoms is supported by or inconsistent with other evidence of

record:

In determining the extent to which your symptoms, such as pain, affect
your capacity to perform basic work activities, we consider all of the

27

available evidence described in paragraphs (c)(1) through (c)(3) of this section. We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4).

SSR 96-7p explains the two-step process established by the Commissioner's regulations

for evaluating a claimant's symptoms and their effects:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. . . .

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's

28

statements based on a consideration of the entire case record.

When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements. In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:

    1. The individual's daily activities;

    2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

    3. Factors that precipitate and aggravate the symptoms;

    4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

    5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

    6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

    7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

    <u>Case law interpreting the statute and regulations</u>. At the outset, it is important to

keep in mind that symptoms are the claimant's "description of [his/her] physical or

mental impairment."  20 C.F.R. § 404.1528(a). Inevitably, evaluating symptoms involves

making credibility determinations about the reliability of the claimant's self-report of

his symptoms. *Smith ex rel E.S.D. v. Barnhart*, 157 Fed.Appx. 57, 62 (10th Cir. December.

5, 2005) (not published)("Credibility determinations concern statements about symp-

toms.")

     "Where the symptoms and not the underlying condition form the basis of the

disability claim, a two-part analysis is used in evaluating complaints of disabling pain."

*Rogers v. Commissioner of Social Sec.,* 486 F.3d 234, 247 (2007); SSR 96-7p, 1996 WL 374186

(July 2, 1996). That test was first set out in *Duncan v. Secretary of Health and Human

Services*, 801 F.2d 847, 853 (6th Cir. 1986). First, the Court must determine "whether there

is objective medical evidence of an underlying medical condition."  If so, the Court must

then

        examine:  (1) whether objective medical evidence confirms the
        severity of the alleged pain arising from the condition; or (2)
        whether the objectively established medical condition is of such a
        severity that it can reasonably be expected to produce the alleged
        disabling pain.

*Duncan*, 801 F.2d at 853.  Any "credibility determinations with respect to subjective

complaints of pain rest with the ALJ." *Siterlet v. Secretary of Health and Human Services*,

823 F.2d 918, 920 (6th Cir. 1987); *Rogers,* 486 F.3d at 247 (citing  *Walters v. Comm'r of Soc.

Sec.,* 127 F.3d 525, 531 (6th Cir.1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir.1990);

*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir.1981)).  The ALJ is

required to explain her credibility determination in her decision, which "'must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *See id*. (quoting SSR 96-7p).  Furthermore, the ALJ's decision must be supported by substantial evidence.  *Rogers,* 486 F.3d at 249.

Discussion of ALJ's credibility determination. The administrative law judge properly considered the medical evidence of record to determine the credibility of plaintiff's allegations of pain. The administrative law judge noted that plaintiff could almost perform a full squat and that he was able to lift his 3 ½ year old daughter. He noted that Dr. Lehman, a psychologist, examined plaintiff and assigned him a GAF score of 65, which indicates that an individual has some symptoms or difficulty social or occupational functioning but generally functions pretty well. Dr. Halley, an orthopedic specialist found no evidence of acute radiculopathy or muscle weakness in the lower extremities. He further noted that plaintiff continued to lift his daughter and that he could lift up to 20 pounds, although not on a repetitive basis. The administrative law judge further noted that two orthopedic specialists concluded that plaintiff could work at a sedentary level, which was consistent with plaintiff's daily activities. As a result, the administrative law judge's credibility determination is supported by substantial evidence.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.**  It is **FURTHER RECOMMENDED** that plaintiff's motion for

summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

           s/Mark R.  Abel           
           United States Magistrate Judge